JRB/BAM: USAO2024R00498

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PX26CR138 |
| | * | |
| DAVID M. MORENS, | * | (Conspiracy Against the United States, |
| | * | 18 U.S.C. § 371; Destruction, |
| Defendant | * | Alteration, or Falsification of Records |
| | * | in Federal Investigations, |
| | * | 18 U.S.C. § 1519; Concealment, |
| | * | Removal, or Mutilation of Records, |
| | * | 18 U.S.C. § 2071; Aiding and Abetting, |
| | * | 18 U.S.C. § 2) |
| | * | |
| | * | **FILED UNDER SEAL** |
| | * | |

\*\*\*\*\*\*\*

## INDICTMENT

The Grand Jury for the District of Maryland charges that at all relevant times to this indictment:

### COUNT ONE
### (Conspiracy Against the United States)

### INTRODUCTION

1.      On or about March 13, 2020, President Donald J. Trump declared a nationwide emergency because of the world-wide spread of the then-novel coronavirus, SARS-CoV-2 ("COVID-19") (hereinafter, the "COVID-19 pandemic"). On or about March 15, 2020, states began to implement restrictive measures to prevent the spread of the virus. Businesses were shuttered, schools were closed, millions became sick, and over one million Americans died. And as the nation braced itself against the impact of the COVID-19 pandemic, it sought answers about the origin of the virus and how it could be prevented and treated. The COVID-19

pandemic had a profound impact on the United States, and the records generated by its agencies and employees responsible for leading the nation's response to the virus had significant historical, institutional, scientific, medical, and public value.

2.      As explained herein, **DAVID M. MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others defrauded and committed offenses against the United States by hiding from public view various federal records related to this significant historical event.

3.      The National Institute of Allergy and Infectious Diseases (NIAID) was an agency of the United States and was part of the National Institutes of Health (NIH), a component of the Department of Health and Human Service (HHS).  NIAID played a leading role in the national response to the COVID-19 pandemic.  NIAID was responsible for identifying and responding to emerging public health threats. NIAID, through its leadership in the Office of the Director, provided public health guidance and informed the public about the nature, origin, and effects of COVID-19.  NIAID's Office of the Director was located on NIH's main campus in Bethesda, Maryland.

4.      **MORENS** resided in Montgomery County, Maryland.  **MORENS** was a medical doctor.  For much of his career, **MORENS** was a federal employee and public official.  From 1979 to 1982 and 1998 to 2021, **MORENS** served in the U.S. Public Health Service, and ultimately reached the rank of Captain.  From 1983 to 1998, **MORENS** was in the U.S. Army Reserves, where he served to the rank of Lieutenant Colonel.  From in or about 2006 through December 31, 2022, **MORENS** served as Senior Advisor to Senior NIAID Official 1, in the Office of the Director (OD).

5.      **MORENS**'s duties as Senior Advisor were broad. **MORENS** advised Senior NIAID Official 1 and other senior level NIAID staff on a host of substantive scientific and public

health management matters involving the full range of NIAID's short and long-term major infectious disease-related activities. Among other things, his tasks included advising on senior-level policies, developing recommendations and solutions to issues impacting NIH, and writing and editing manuscripts. **MORENS** provided guidance and expertise to senior staff members on epidemiological studies and issues related to infectious disease planning and management, including those involving issues of significant importance to the public, Congress, and scientific communities. **MORENS** was responsible for advising Senior NIAID Official 1 for meetings with officials from Congress, the White House, NIH, HHS, other Federal agencies, and outside organizations. **MORENS** was responsible for assuring that Senior NIAID Official 1 was provided with sound alternatives for courses of action to ensure that priorities and policies were implemented and the public was as fully protected against public health threats as possible.

6. As Senior Advisor, **MORENS** gathered information from grantees and others in the scientific community to establish facts regarding the nature of COVID-19, to understand NIH and NIAID's historical activities in coronavirus research, to assist in formulating policy and procedures, and to brief Senior NIAID Official 1 and assist Senior NIAID Official 1 in briefing others, including the President of the United States, Congress, and the public. As part of his duties, **MORENS** authored and co-authored numerous papers related to the COVID-19 outbreak that placed the pandemic in its historical context, advocated for continued surveillance of animal populations (like bats) to detect the source of coronaviruses, or both.

7. CO-CONSPIRATOR 1 was the President and Chief Executive Officer of COMPANY #1, from 2009 to January 2025. CO-CONSPIRATOR 1 was a resident of New York.

8. COMPANY #1 was a non-profit organization headquartered in New York, New York, with a stated mission of protecting people, animals, and the environment from emerging infectious diseases. Through COMPANY #1, CO-CONSPIRATOR 1 researched the origins, transmissibility, virility, and impacts of potentially emergent infectious diseases, including those associated with coronaviruses originating from animals like bats (i.e. zoonotic viruses).

9. In a Notice of Award (NOA) dated May 27, 2014, NIH/NIAID awarded Grant Number 1R01AI110964, "Understanding the Risk of Bat Coronavirus Emergence," to COMPANY #1. CO-CONSPIRATOR 1 was the Project Director (PD)/Principal Investigator (PI) for the bat coronavirus grant. The Wuhan Institute of Virology (WIV) in Wuhan, China received a subaward from COMPANY #1 on the bat coronavirus grant.

10. CO-CONSPIRATOR 2, an individual known to the grand jury, was a physician, scientist, and professor who worked for an academic institution that also received grant monies from NIH, but not for the bat coronavirus grant. CO-CONSPIRATOR 2 was named as a Co-Investigator with CO-CONSPIRATOR 1 on a grant application related to Emerging Infectious Disease Research Centers filed by COMPANY #1 in June 2019 and awarded by NIH during the summer of 2020.

## The Federal Records Act (FRA)

11. The preservation of federal records is crucial to accountability and transparency. Federal records hold informational value and document the transaction of public business, functions, policies, decision, procedures, and the operations of the organization.

12. In recognizing the importance of federal records, Congress enacted the FRA in 1950. The FRA governs the creation, management, and disposal of federal records by agencies. A federal "record" encompasses all recorded information, regardless of form or characteristics,

made or received by a federal agency under federal law or in connection with the transaction of public business, and preserved or appropriate for preservation by that agency. 44 U.S.C. § 3301.

13.    In accordance with federal law, HHS established safeguards against the removal or loss of federal records determined to be necessary and required by regulations of the National Archivist.  44 U.S.C. § 3105.  The safeguards included making it known to officials and employees of the agency (1) that records in the custody of the agency are not to be alienated or destroyed except in accordance with the applicable law, and (2) the penalties provided by law for the unlawful removal or destruction of records.

14.    Federal law prohibited an officer or employee of an executive agency from creating  or sending a record using a non-official electronic messaging account unless such officer or employee—(1) copied an official electronic messaging account of the officer or employee in the original creation or transmission of the record; or (2) forwarded a complete copy of the record to an official electronic messaging account of the officer or employee not later than 20 days after the original creation or transmission of the record. 44 U.S.C. § 2911.

15.    NIH provided yearly training on its employees' obligations with respect to the FRA.  According to the training **MORENS** received, "[t]he interactions between NIH and its staff with the public and other federal agencies are also captured through federal records." **MORENS** was instructed that if information or material facilitated agency business, then it was a federal record. **MORENS** was instructed that if he was not sure if a document was a federal record, then he should consult a record liaison.

16.    **MORENS** was also informed that: (1) federal records could be in any form or medium, such as electronic formats; (2) federal records were the property of the federal government; (3) employees were required to store federal records in agency-approved

recordkeeping systems; (4) email records were required to be created, sent, or received using an NIH email account; and (5) he was not to use a personal email account to conduct NIH business.

17.    **MORENS** was further informed that records were only considered personal files if the materials were not used to conduct agency business. Personal files included materials created outside an employee's responsibilities and work at NIH.  Personal files were required to be kept separate from federal records.

18.    Within the NIH, most federal records were temporary records that could be destroyed after a required holding period.  To manage the disposal of email records, the NIH adopted the "capstone approach."  For non-capstone employees, such as **MORENS**, the holding period for emails was generally seven years.

19.    The NIH, however, was required by law to suspend any destruction of records responsive to a Freedom of Information Act request until the request was satisfied.  Any email deleted or removed from the email system before the seven-year minimum retention was an unauthorized destruction or removal of a federal record.

## The Freedom of Information Act (FOIA)

20.    "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA provides that any person has a right to obtain access to federal agency records, except to the extent that such records are protected from public disclosure by one or more of nine exemptions or by one or more of three special law enforcement record exclusions.  FOIA thus established a statutory right of public access to executive branch information in the federal government.

21. HHS implemented FOIA for HHS records. HHS's implementing regulations for FOIA, at 45 C.F.R. Part 5, set forth the process by which records could be requested, the reasons why some records were exempt from disclosure, and the administrative and legal remedies available should a requester disagree with an initial disclosure determination made by HHS.

22. HHS administered FOIA with a presumption of openness. HHS FOIA regulations called for the disclosure of records or information even if exempt from disclosure under FOIA whenever disclosure would not foreseeably harm an interest protected by a FOIA exemption and disclosure was not prohibited by law. 45 C.F.R. § 5.2.

23. A FOIA Officer was an HHS official who had been delegated the authority, among other things, to release or to withhold records in response to a FOIA request. Pursuant to HHS FOIA regulations, "only FOIA Officers have the authority to release or withhold records or to waive fees in response to a FOIA request."

24. The FOIA Officer for NIAID was responsible for receiving FOIA requests, distributing FOIA requests to personnel likely to have responsive records ("affected personnel"), instructing affected personnel to conduct searches for materials responsive to FOIA requests, monitoring and receiving returns of such information, and recommending FOIA exemptions for certain responsive records.

25. A FOIA request meant a written request that reasonably described the records sought under the FOIA provisions. The scope of a FOIA request could be narrowed through negotiation and agreement between a FOIA officer and a requestor.

**Multiple FOIA Requests Sought Information and Communications Concerning MORENS, COMPANY #1, and/or CO-CONSPIRATOR 1**

26. In the period between April 2020 and December 2022, NIAID received hundreds of FOIA requests related to COVID-19. Of those requests, many sought access to

communications involving **MORENS**, COMPANY #1, and/or CO-CONSPIRATOR 1, including but not limited to the following:

    a. Request 54052 filed by Judicial Watch, Inc. on April 22, 2020;

    b. Request 54085 filed by *Science* Magazine on April 28, 2020;

    c. Request 57014 filed by an individual on September 8, 2021;

    d. Request 57707 filed by U.S. Right to Know on January 21, 2022;

    e. Request 57811 filed by the Whistleblower Protection Project on February 5, 2022;

    f. Request 58690 filed by the Heritage Foundation on July 22, 2022; and

    g. Request 58647 filed by an individual on July 11, 2022.

### January 2020 – March 2020, The Onset of COVID-19

27.    Beginning in January 2020, **MORENS** and CO-CONSPIRATOR 1 began communicating about the emerging coronavirus in China. On or about January 9, 2020, **MORENS** sent an email, using his official NIH email account, Dmorens@niaid.nih.gov, to CO-CONSPIRATOR 1 and others to inquire whether CO-CONSPIRATOR 1 and others had "any inside info on this new coronavirus that isn't yet [in] the public domain?" That same day, on or about January 9, 2020, CO-CONSPIRATOR 1 responded that he had "lots of information" and referred to COMPANY #1's "coronavirus grant specifically focused on China."

28.    On or about January 27, 2020, CO-CONSPIRATOR 1 emailed bullet points about COMPANY #1's bat coronavirus grant to **MORENS** at his NIH email account. CO-CONSPIRATOR 1 stated in the beginning of his email that he was providing this information so that **MORENS** might relay it to Senior NIAID Official 1 for public use, stating: "a few things

for your information and hopefully to pass on to [Senior NIAID Official 1] for when he is being interviewed re[:] the new CoV."

29.    That same day, on or about January 27, 2020, **MORENS** responded from his NIH email account stating, in relevant part: "I WILL pass this on to [Senior NIAID Official 1]." **MORENS** then emailed the information provided to him by CO-CONSPIRATOR 1 to Senior NIAID Official 1 through Senior NIAID Official 1's Chief of Staff.

30.    Beginning in or about February 2020, **MORENS** wrote about coronaviruses as part of his NIH duties. **MORENS** used his NIH email account to participate in an email chain with CO-CONSPIRATOR 1 and NIH colleagues to suggest publications on topics related to the outbreak of COVID-19. This included, according to an email from **MORENS** to CO-CONSPIRATOR 1 and other NIH employees, "timely commentaries about key aspects of the coronavirus situation, things that are 'from 30,000 feet,' i.e., broad perspectives, and publishable either in journals willing to publish quickly or in key newspapers or other media."

31.    Between February 2020 and March 2020, **MORENS** and CO-CONSPIRATOR 1 authored and co-authored articles and commentaries about the COVID-19 pandemic. Their correspondence, including those discussed above, occurred using **MORENS**'s NIH email account.

32.    On or about April 19, 2020, NIH issued a letter notifying COMPANY #1 that it was reviewing allegations that WIV released the coronavirus responsible for the COVID-19 pandemic. While it reviewed the allegations, NIH instructed COMPANY #1 to cease providing any funds from Grant Number R01AI110964 to WIV.

33.    On or about April 24, 2020, NIH emailed CO-CONSPIRATOR 1 a letter notifying him that NIH had elected to terminate Grant Number R01AI110964 (the "termination

letter"). CO-CONSPIRATOR 1 forwarded the termination letter to CO-CONSPIRATOR 2 the same day. CO-CONSPIRATOR 2 urged CO-CONSPIRATOR 1 to challenge the termination but "certainly not before the EIDRC funding comes through." COMPANY #1 had applied to NIH for funding of an Emerging Infectious Disease Regional Center (EIDRC), a grant worth in excess of $7 million. The EIDRC grant had not yet been awarded.

## THE CONSPIRACY AND ITS OBJECTS

34.     Beginning in or about April 2020 and continuing through at least in or about June 2023, in the District of Maryland and elsewhere, the defendant,

**DAVID M. MORENS,**

knowingly and willfully conspired and agreed with CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and with others known and unknown to the Grand Jury, to:

a.      commit offenses against the United States, namely to commit violations of 18 U.S.C. § 1519, whereby **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and their co-conspirators knowingly destroyed, concealed, and covered up a record, document, and tangible object with the intent to impede, obstruct and influence the investigation and proper administration of a matter of within the jurisdiction of the Department of Health and Human Services, National Institute of Health, and the National Institute of Allergy and Infectious Diseases, a department and agencies of the United States, and in relation to or contemplation of any such matter or case;

b.      commit offenses against the United States, namely to commit violations of 18 U.S.C. § 2071(a), whereby **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and their co-conspirators willfully and unlawfully and with the intent to take, conceal, remove,

mutilate, obliterate, and destroy, and attempt to do so, a record, paper, document, and thing filed and deposited with any public officer of the United States;

     c.    to commit offenses against the United States, namely to commit violations of 18 U.S.C. § 201(c), whereby CO-CONSPIRATOR 1, a federal grantee, directly and indirectly gave, offered, and promised things of value to **MORENS**, a public official, who directly and indirectly demanded, sought, received, accepted, and agreed to receive or accept anything of value, otherwise than as provided by law for the proper discharge of official duties, for and because of official acts performed and to be performed by **MORENS** for CO-CONSPIRATOR 1 and COMPANY #1; and

     d.    defraud the United States, that is, to hamper, hinder, impede, and obstruct by craft, trickery, treachery, deceit, and dishonest means, the lawful and legitimate functions of the Department of Health and Human Services, National Institute of Health, and the National Institute of Allergy and Infectious Diseases in complying with the Freedom of Information Act and the Federal Records Act.

**MANNER AND MEANS OF THE CONSPIRACY**

It was part of the conspiracy that:

35.    **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury used **MORENS**'s personal, non-government-issued email account(s) to create, transfer, and exchange federal records that pertained to **MORENS**'s responsibilities as a Senior Advisor at NIAID. The federal records created, transferred, and exchanged via **MORENS**'s personal, non-government-issued email address included the following types of records, among others::

     a.    controlled NIH work product;

b.      records concerning efforts to influence NIH to fund COMPANY #1;

c.      records concerning the COMPANY #1 bat coronavirus grant termination, reinstatement, suspension, and subsequent negotiation, including the drafting and editing of statements and responses on behalf of COMPANY #1 to NIH;

d.      records concerning public writings on the origins of the COVID-19 virus;

e.      records concerning congressional oversight of NIH and its grants related to COVID-19;

f.      records concerning **MORENS**'s access to Senior NIAID Official 1 and his use of that access to convey information on behalf of COMPANY #1 to influence Senior NIAID Official 1.

36.     **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury concealed, removed, destroyed and caused the concealment, and removal of federal records to evade FOIA and the FRA.

37.     **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury concealed their communications so that they could utilize **MORENS**'s stature, connections, and access within the scientific community as a result of his position as Senior Advisor to Senior NIAID Official 1 to advance the interests of COMPANY #1; within NIH/NIAID, the scientific community, and publicly.

38.     **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury concealed their communications so that they could communicate with others in the scientific community in support of COMPANY #1 and published papers, articles, and other writings supportive of COMPANY #1—but without directly including CO-CONSPIRATOR 1 in the communications or as a contributor to the papers, to generate the

appearance of disinterested scientific consensus and avoid the necessity of declaring competing interests.

39. **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury policed the use of **MORENS**'s government-issued email account by (1) reminding **MORENS** to avoid communicating using his government-issued email account and (2) explicitly requesting that those contacting **MORENS** do so through his non-government-issued email accounts to avoid exposing their communications to FOIA requests.

40. CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury emailed information to **MORENS** at **MORENS**'s non-government-issued personal Gmail account for **MORENS** to relay to Senior NIAID Official 1—while instructing **MORENS** to use means of communication that would not be discovered in a FOIA search.

41. **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury shared facts, press reports on the origin of COVID-19 and COMPANY #1, information regarding the administrative proceedings on the bat coronavirus grant, information regarding Congressional inquiries and activities related to COVID-19 and the bat coronavirus grant, information regarding the drafting and publication of articles, editorials, and letters, and information relating to FOIA requests. **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury shared that material and information to anticipate press reactions, develop talking points, and coordinate responses.

42. CO-CONSPIRATOR 1 provided and promised to provide **MORENS** with things of value for and because of official acts and "behind the scenes shenanigans" favorable to CO-CONSPIRATOR 1 and COMPANY #1. CO-CONSPIRATOR 1 and **MORENS** concealed their

conduct by communicating via **MORENS**'s Gmail account and sending items to **MORENS**'s residence.

43.    **MORENS** received and agreed to receive things of value from CO-CONSPIRATOR 1 for or because of official acts favorable to CO-CONSPIRATOR 1 and COMPANY #1, including by engaging in "behind the scenes shenanigans." **MORENS** and CO-CONSPIRATOR 1 concealed their conduct by communicating via **MORENS**'s Gmail account and sending items to **MORENS**'s residence.

## OVERT ACTS

44.    In furtherance of the conspiracy, and to effect the objects thereof, at least one of the co-conspirators committed or caused to be committed at least one of the following overt acts, among others, in the District of Maryland, and elsewhere:

### The Co-Conspirators Plotted to Conceal Federal Records to Evade FOIA

45.    **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2 exchanged emails and took actions directed in whole or in part towards ensuring written communications between them related to government business would not be available to HHS, NIH, or NIAID to respond to any applicable FOIA request. The conspirators accomplished this objective by keeping discussions related to COMPANY #1, CO-CONSPIRATOR 1, the bat coronavirus grant, and other NIH/NIAID or government business on **MORENS**'s Gmail account. Set forth below are select communications where **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others expressed their intent to conceal their correspondence to avoid public disclosure via FOIA of their communications. Except where specifically indicated, the following emails were all sent from or received by **MORENS** exclusively at his Gmail account.

a.      On or about April 25, 2020, after learning about the cancellation of the bat coronavirus grant, **MORENS** forwarded his communications with CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 from his NIH email account to his Gmail account.  **MORENS** then emailed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2, stating, "***This is sent from my gmail account.  Please send all replies here To gmail*** […] There are things I cant say except [Senior NIAID Official 1] is aware and I have learned that there are ongoing efforts within NIH to steer through this with minimal damage to you, [CO-CONSPIRATOR 1], and colleagues, and to nih and niaid." (emphasis added).

b.      On April 26, 2020, CO-CONSPIRATOR 1 wrote to **MORENS** and CO-CONSPIRATOR 2, with copies to others, including COMPANY #1 staff, stating: "David – We'll communicate with you via gmail from now on."

c.      On or about April 28, 2020, CO-CONSPIRATOR 1, in an email titled "More FoIAs on their way – this time to NIAID, incl. emails to us," wrote to **MORENS** to alert him about a group "targeting [Senior NIAID Official 1] and looking for email to us and others re. Wuhan." **MORENS** responded by thanking CO-CONSPIRATOR 1 "for the heads up," stating, "We all dread these FOIAs, they take up so much time."

d.      On or about May 3, 2020, **MORENS** emailed members of a prominent professional medical organization to enlist them in speaking out on behalf of CO-CONSPIRATOR 1 and COMPANY #1 because of the termination of the bat coronavirus grant. The email stated, in part:

> Colleagues, ***I need to keep this correspondnce [sic] off of USG emails for obvious reasons, so am sending from gmail […] I am under Multiple FOIAs already***, and [CO-CONSPIRATOR 1] is facing orchestrated death threats … We, [CO-CONSPIRATOR 2] and I, have advised [CO-CONSPIRATOR 1] to lay low, not go to the press, work through nih to get a face to face meeting, and let others come to his defense."

(emphasis added).

      e.      On or about May 15, 2020, **MORENS** emailed CO-CONSPIRATOR 1 falsely stating that the NIAID FOIA officer had told **MORENS** that he could "cover" his "rear" "by deleting emails and making use of foia delays," and that he would "soon need to train" himself "to use only gmail," and that he appreciated that CO-CONSPIRATOR 1 was "sensitive to that."

      f.      On or about May 16, 2020, **MORENS** emailed CO-CONSPIRATOR 1 about an article **MORENS** was drafting in part to benefit CO-CONSPIRATOR 1 and COMPANY #1, stating: "We all agree that we want to keep off Of it any fingerprints of you, [North Carolina Scientist 1] and any [COMPANY #1] or grant colleagues." **MORENS** concluded by stating: "I need to keep this off of govt email and govt phone text."

      g.      On or about July 2, 2020, **MORENS** sent an email from his NIH account to his Gmail account with the subject: ***"[CO-CONSPIRATOR 1] in outlook.  Dele [sic] or send to gmail*****."** (emphasis added).

      h.      On or about July 3, 2020, **MORENS** submitted and caused the submission of a scientific commentary to a prominent medical journal for publication that advocated COVID-19 emerged from nature and not from a lab.  The piece was authored by **MORENS** and was intended to benefit COMPANY #1 and CO-CONSPIRATOR 1.

      i.      On or about August 27, 2020, after learning that NIH had awarded a $7.5 million grant to COMPANY #1, the same EIDRC grant the conspirators had been concerned might be affected by the termination of the bat coronavirus grant, **MORENS** emailed CO-CONSPIRATOR 1 from his NIH email account, stating: "Ahem…. do I get a kickback???? Too much fooking money! DO you deserve it all? Let's discuss…."  In response, on or about August

28, 2020, CO-CONSPIRATOR 1 emailed **MORENS** at his Gmail account stating, in part, "of course there's a kick-back [sic]. *It starts with 5 more years of FoIA [sic] requests* […] I just hope it doesn't culminate in 5 years in Federal jail […]" (emphasis added).

j.　　On or about November 19, 2020, in an email with the subject line, "Attacks on [COMPANY #1] continue," CO-CONSPIRATOR 1 wrote **MORENS** and CO-CONSPIRATOR 2 stating, in part: "***David, I'm using your gmail address to keep you out of the FoIA target***…Just wanted you to know that we're still under attack here at COMPANY #1. The US Right to Know (an anti-GMO, anti-vaxx group associated with Organic consumers.org) Foia'd NIH for our emails and grants. NIH refused, they've now sued." (emphasis added).

k.　　On or about February 23, 2021, **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2 exchanged emails, under the subject line "Briefing [Senior NIAID Official 1]," where CO-CONSPIRATOR 2 told **MORENS** to "pay attention to the email address you use," stating: If you get FOIA'ed and have to respond it will have [CO-CONSPIRATOR 1], and, of lesser importance, me on the correspondence. The less we provide the enemy the better."

l.　　On or about February 24, 2021, **MORENS** emailed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2, under the subject line "Briefing [Senior NIAID Official 1]," stating, in part: "[I] learned from our foia lady here how to make emails disappear after I am foia'd but before the search starts, so i think we are all safe. Plus I deleted most of those earlier emails after sending them to gmail."

m.　　On or about February 25, 2021, **MORENS** emailed CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 stating that he and Senior NIAID Official 1 received a "huge FOIA yesterday seeking any and all documents, emails, etc., that mention the words 'Wuhan

Institute' or 'WIV' [. . . .]You[r] names will not show up in this FOIA, at least not from my info.d"

n.    On or about June 17, 2021, **MORENS**, in an email with the subject line, "CONFIDENTIAL WITHIN OUR SMALL GROUP, PLEASE," emailed CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others stating that he received a production request from "5 US Senators" about "some of the issues we have been dealing with over the past year, focusing on the origins of COVID-19, the terminat6ion [sic] of NIH's major sarbecovirus grant, and related issues." **MORENS** added that he had "retained very few documents on these matters, and continue to request that correspondence on sensitive issues be sent to me at my gmail address, [. . ..]@gmail.com."

o.    On or about October 5, 2021, **MORENS** emailed CO-CONSPIRATOR 1 to warn CO-CONSPIRATOR 1 that "a foia picked up an email" he had sent CO-CONSPIRATOR 1 about [Senior NIAID Official 1]. **MORENS** wrote: "I deleted that email but i now learn [sic] that every email I ever got/sent since 1998 is captured and will be turned over, whether or not i instantly deleted it […] *Gmail, phone, text…. . i need to scrupulously rely on those exclusively*." (emphasis added).

p.    On or about October 6, 2021, CO-CONSPIRATOR 1 emailed **MORENS**, CO-CONSPIRATOR 2, and others to warn them about prior emails that were either sent to or received from **MORENS**'s NIH account that could become public because of FOIA requests. The email had the subject line, "1st batch of emails with David Morens'@Niaid address that might have been FoIA'd." CO-CONSPIRATOR 1 attached 27 emails, and wrote in the body of the email:

> David's NIH email address was FoIA'd and they're pulling out emails to me or [Senior NIAID Official 1] and about Wuhan etc. You're in some of these. We

started using David's gmail address in April 2020 around the time of the cancelation of our grant, but some slipped through the net, as is expected ... "There is some embarrassing stuff in there, the most heinous is: [. . .] Some details of what happened with NIH cancelation [sic] and what my response to that was, and how you helped me shape it [. . .] if these emails are with reporters, they'll use them to create stories as per above, and with headlines like: [']Powerful cabal of scientists from within NIH helped draft anti lab-leak narrative['] and '[CO-CONSPIRATOR 1] suspected WIV may have continued GoF work outside of NIH grant['][.]

q.    On or about October 6, 2021, CO-CONSPIRATOR 1 sent **MORENS**, CO-CONSPIRATOR 2, and others an email with the subject like: "2nd batch of emails possibly FoIA'd." This email had approximately 34 prior emails. CO-CONSPIRATOR 1 identified emails that may cause issues for the co-conspirators if they were disclosed to the public via FOIA, including an email that CO-CONSPIRATOR 1 described as continuing "the story that we were working in a Cabal to orchestrate stuff." CO-CONSPIRATOR 1 concluded by stating: "*I will massively increase my scrutiny of all emails that come from David or cc him to make sure the NIH address is replaced by his gmail from now on. Really important!*" (emphasis added)

r.    On or about October 27, 2021, **MORENS** emailed CO-CONSPIRATOR 2 about his continuing efforts to keep emails away from FOIA, stating: "i just want to let you know i am working with our IT guys to get a fix where my gmail no longer gets on my govt phone or computer," and that "[s]o far it seems that my phone and my gmail are fairly safe." **MORENS** then asked that CO-CONSPIRATOR 2 "let [CO-CONSPIRATOR 1] know i am following events and will stay in touch with him through you."

s.    On or about October 27, 2021, **MORENS** emailed CO-CONSPIRATOR 2 stating that "it is PROBABLY safe for u to contact me on gmail but if there is anything sensitive or about [Senior NIAID Official 1], best to use the phone."

t.    On or about October 27, 2021, in a note to himself, **MORENS** emailed his NIH account a contentless email with the subject line, "gmail signature remove nih."

u.      On or about November 18, 2021, **MORENS** emailed CO-CONSPIRATOR 2 declaring that his "gmail is now safe from FOIA and hacking on all of my devices" and that it "should be safe to communicate safely with you, [CO-CONSPIRATOR 1], and others, as long as we use my private gmail." **MORENS** added:

> Please pass this on to [CO-CONSPIRATOR 1] and *I ask you both that NOTHING gets sent to me except to my gmail, and make sure that what gets sent to my gmail doesn't have a cc to another government employee who could be FOIA'd*." (emphasis added)

v.      On or about December 7, 2021, in an email with the subject line, "[CO-CONSPIRATOR 1] and the Salem Witch Trials," **MORENS** emailed the Chair of the COMPANY #1 Board "to put in a word for [CO-CONSPIRATOR 1] and the [COMPANY #1] team," and reminded the recipients of the email to "*keep all communications like this on private email so that it can't be retrieved via a FOIA*." (emphasis added).

w.      Between on or about September 15, 2022, and on or about September 18, 2022, **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others participated in an email exchange regarding a "FOIA Request – PDN [Pre-Disclosure Notification] Contact." CO-CONSPIRATOR 1 anticipated headlines that might come from the public disclosure of the emails, such as "leading scientists conspire to undermine investigation into lab leak theory via back-channel to [Senior NIAID Official 1]."

### The Use of MORENS's Gmail Account to Create and Conceal Federal Records, Exchange Non-Public NIH Information, and Secretly Provide Information to Senior NIAID Official 1

46.     **MORENS**, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others used **MORENS**'s Gmail account to create, exchange, and conceal federal records, including to pass non-public NIH information, and to "back-channel" information to Senior NIAID Official 1, as

set forth below. Except where specifically indicated, the following emails were all sent from or received by **MORENS** at his Gmail account.

      a.     On or about April 28, 2020, **MORENS** emailed CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, the Chair of COMPANY #1's Board, and CO-CONSPIRATOR 1's Chief of Staff a copy of two internal and nonpublic NIH records. The first NIH record **MORENS** emailed was titled "NIAID COVID-19 Implementation Plan." The record was marked "FOUO" (For Official Use Only) on every page, and identified, among other things, COVID-19-related research. The second NIH record **MORENS** emailed was titled "NIAID SARS-CoV-2 Research Updates." Each page of this document was also marked FOUO.

      b.     On or about January 21, 2021, CO-CONSPIRATOR 1 emailed **MORENS** and others telling **MORENS** to "please ask [Senior NIAID Official 1] to ask [the U.S. Secretary of State] to send me an email with the information in it and I'll share it with the WHO team." CO-CONSPIRATOR 1 asked **MORENS** to "[p]lease get the message to [Senior NIAID Official 1] that the only way to really understand the risk of these viruses, and protect the planet against the next COVID has to be working with our China counterparts." At the time, CO-CONSPIRATOR 1 was in China on a World Health Organization (WHO) mission to investigate the origins of COVID-19. CO-CONSPIRATOR 1 was the only U.S. member on the mission.

      c.     On or about February 16, 2021, CO-CONSPIRATOR 1 emailed **MORENS** and CO-CONSPIRATOR 2 that he hoped **MORENS** "might whisper in [Senior NIAID Official 1]'s ear" or "smooth the right passage" regarding reinstatement of the bat coronavirus grant.

      d.     On or about February 21, 2021, CO-CONSPIRATOR 1 emailed **MORENS** stating that it was "a v. good idea re. Briefing [Senior NIAID Official 1]" and that he

would offer to brief "[Senior NIAID Official 1] and the NIAID senior staff" before briefing the "NIAID COVID group."

e.      On or about March 10, 2021, CO-CONSPIRATOR 1 introduced a Nobel Laureate to **MORENS** over email stating, "introducing you to David Morens who works directly for [Senior NIAID Official 1]." CO-CONSPIRATOR 1 wrote that the Nobel Laureate was "speak[ing] out about the abuse of the funding system for political gain," and that the Nobel Laureate wanted to "reach out to [Senior NIAID Official 1] by email but obviously that's difficult these days" and that he was hoping **MORENS** would "make sure an email from [the Nobel Laureate] to [Senior NIAID Official 1] would be read." CO-CONSPIRATOR 1 concluded the email by stating – "I will now exit the conversation because of my clear conflict of interest!"

f.      On or about March 29, 2021, **MORENS** made edits and comments to CO-CONSPIRATOR 1's written response to two letters the NIH Deputy Director for Extramural Research had sent about COMPANY #1's bat coronavirus grant. **MORENS** was aware that the letter would be read by the NIH Deputy Director for Extramural Research and possibly others, stating, "this will probably be read by [the NIH Deputy Director for Extramural Research] but will perhaps be leaked and ready by many oth-ers [sic]." Below is one of the comments **MORENS** made to strengthen the letter for the benefit of CO-CONSPIRATOR 1 and COMPANY #1.



g.      On or about April 11, 2021, CO-CONSPIRATOR 1 submitted and caused the submission of the written response to the NIH Deputy Director for Extramural Research, incorporating **MORENS**'s edits and suggestions.  CO-CONSPIRATOR 1 did not disclose that **MORENS** participated in drafting the letter.

h.      On or about April 21, 2021, **MORENS** and CO-CONSPIRATOR 1, with copies to others, exchanged emails regarding a "Zoom meeting with [Senior NIAID Official 1] tomorrow."  In the body of the email, **MORENS** described various topics relating to the Zoom meeting, including "what info or docs" CO-CONSPIRATOR 1 "would or would not want" **MORENS** to share, and issues Senior NIAID Official 1 would be concerned about, including "the possibility the NIH funded scientists or other esteemed scientists, are in cahoots with politicians wanting to attack him or niaid." **MORENS** added that "*it might be best to connect you two, in an off the record manner*" because "*[w]e are getting FOIA'd non stop, so its most important that [Senior NIAID Official 1] not have anything on the record that could come back to bite*." (emphasis added).

     i.     On or about April 21, 2021, CO-CONSPIRATOR 1 emailed **MORENS** regarding the Zoom meeting with Senior NIAID Official 1. CO-CONSPIRATOR 1 told **MORENS** to "Please feel free to share any docs that I've sent to you, with [Senior NIAID Official 1]. *Hopefully you can do that in a way that avoids FoIA, and if not possible, just show him stuff on the screen share on Zoom.*" (emphasis added).  CO-CONSPIRATOR 1 attached a document titled "Political actions regarding [COMPANY #1]'s work on Coronavirus."

     j.     On or about October 24, 2021, CO-CONSPIRATOR 1 emailed **MORENS**, CO-CONSPIRATOR 2, and the COMPANY #1 Chief of Staff with the subject line, "Draft response to [NIH Deputy Director for Extramural Research] – please review."  CO-CONSPIRATOR 1 wrote that he was "trying to rapidly respond to [the NIH Deputy Director for Extramural Research]'s letter . . . as well as to [the NIH Principal Deputy Director]'s public statement that COMPANY #1 failed to comply with reporting restrictions" in connection with the bat coronavirus grant. CO-CONSPIRATOR 1 attached several documents, including a letter titled, "Response_to_[NIH Deputy Director for Extramural Research]_October_2021_DRAFT.docx." CO-CONSPIRATOR 1 finished the email by stating: "David–I'll send some bullets for you to pass on to [Senior NIAID Official 1] later on."

     k.     On or about October 25, 2021, CO-CONSPIRATOR 1 emailed **MORENS** under the subject line, "Short version of our response to NIH – bullets for sharing." Attached to the email was a "single sheet with bullets" for **MORENS** to share with Senior NIAID Official 1 to convince "folks at NIH" that the NIH Principal Deputy Director was wrong to criticize "[COMPANY #1]'s reporting compliance."  Referencing the draft letter CO-CONSPIRATOR 1 had circulated on October 24, 2021, **MORENS** responded to CO-

CONSPIRATOR 1 stating, "[CO-CONSPIRATOR 1], this is an excellent draft. I will suggest some wordsmithing tweets [sic] later today."

l.      On or about October 25, 2021, CO-CONSPIRATOR 2 replied to the October 24, 2021 email exchange with the subject line, "Draft response to [NIH Deputy Director for Extramural Research] – please review." CO-CONSPIRATOR 2 replied only to CO-CONSPIRATOR 1 and the COMPANY #1 Chief of Staff, leaving **MORENS** off the email. CO-CONSPIRATOR 2 wrote:

> I just spent some time on the phone with David.  He is concerned about the privacy of text and other messages from his cell phone to you and me because he has been using a government phone which permits personal conversations as well.  So even things via gmail sent and received on his cell phone could be FOIA'able.

CO-CONSPIRATOR 2 then communicated **MORENS**'s edits and suggestions to CO-CONSPIRATOR 1's draft letter to the NIH Deputy Director for Extramural Research, stating "[**MORENS**] wanted to reiterate a couple of things [:]"

> First, on the timeline to make it more specific with dates and details. [NIH Program Manager for the bat coronavirus grant] is really important and being sure he is well informed, acknowledges the timeline and the communications you mention, and is on board because he will certainly be questioned. [**MORENS**] also suggested that you discuss with him the need for NIH to check the records and to confirm when documents were filed and acknowledged. And that when you were aware that it was necessary to file the 5 year report the system shut you out and you presumed that was normal process as you were then into the new grant year 1.

m.      On or about October 26, 2021, CO-CONSPIRATOR 1 submitted and caused the submission of a letter to the NIH Deputy Director for Extramural Research containing **MORENS**'s suggestions, including the explanation for why COMPANY #1 failed to timely submit its "5 year report" in connection with the bat coronavirus grant.

## CO-CONSPIRATOR 1 Provided and Promised to Provide
## MORENS With Illegal Gratuities and Sought to Conceal their Discovery

47.     **MORENS** used his role as Senior Advisor to Senior NIAID Official 1 to engage in official acts favorable to CO-CONSPIRATOR 1 and COMPANY #1.  For and because of such official acts, some of which are identified above, and "behind the scenes shenanigans," CO-CONSPIRATOR 1 provided and promised to provide things of value to **MORENS**, which **MORENS** received and agreed to receive.  CO-CONSPIRATOR 1 and **MORENS** concealed their conduct by communicating via **MORENS**'s Gmail account and sending items to **MORENS**'s residence.

a.     On or about June 11, 2020, **MORENS** emailed CO-CONSPIRATOR 1 from his NIH email account stating, "let's win this anti science battle, get you refunded and über funded, then settle scores and kick some ass."

b.     On or about June 25, 2020, CO-CONSPIRATOR 1 gave **MORENS** two bottles of The Prisoner Red Napa Valley wine from Bounty Hunter Rare Wine & Spirits, which was delivered to **MORENS**'s residence in Maryland. The wine included the following message from CO-CONSPIRATOR 1 to **MORENS**:

> This is the first of what I hope will be a continued series of expressions of gratitude for your advice, support, and behind-the-scenes shenanigans in my battle against your bosses boss, his boss, and the ultimate boss on the hill. It takes courage and commitment to do what you've done, given your job and the vindictive nature of the Administration. I am eternally grateful for that, and hope I will be able to return the favor one day. In the meantime...Cheers!

c.     On or about June 25, 2020, upon receipt of the wine, **MORENS** emailed CO-CONSPIRATOR 1 from his Gmail account thanking him for the wine and stating: "Now i am actually going to have to do something to deserve it. Let me think…."  **MORENS** then identified acts that he had performed for CO-CONSPIRATOR 1 and COMPANY #1, including

writing a "scientific commentary that outlines the importance of what [CO-CONSPIRATOR 1] and others have been doing, but without mentioning [CO-CONSPIRATOR 1] or the grant termination[.]"

d.       On or about June 26, 2020, CO-CONSPIRATOR 1 emailed **MORENS** at his Gmail account promising additional things of value, stating: "Consider this my phase II gift. Phase III might actually involve a meal - the Michelin starred restaurants are opening in Paris - DC and New York will do eventually!"

e.       On or about July 3, 2020, **MORENS** submitted and caused the submission of a scientific commentary to a prominent medical journal for publication that advocated COVID-19 emerged from nature and not from a lab.  **MORENS** was listed as an author on the scientific commentary.  The scientific commentary was to benefit COMPANY #1 and CO-CONSPIRATOR 1, and was "funded in part by the intramural research program of the National Institute of Allergy and Infectious Diseases (NIAID), National Institutions of Health (NIH)."

f.       On or about October 6, 2021, in an email with the subject line "2nd batch of emails possibly FoIA'd," CO-CONSPIRATOR 1 emailed **MORENS** at his Gmail account, and other individuals, to identify emails sent from **MORENS**'s NIH account that may cause issues for the co-conspirators if they were disclosed to the public via FOIA.  In the email, CO-CONSPIRATOR 1 specifically referenced one email where CO-CONSPIRATOR 1 had "sent David a bottle of wine," but noted that "it's not absolutely cut and dried [sic] that this happened, but it gives that impression." CO-CONSPIRATOR 1 also opined: "I believe if the wine has a value of $20 or less, that's fine."

18 U.S.C. § 371

## COUNTS TWO AND THREE
### (Destruction, Alteration, or Falsification of Records in Federal Investigations)

1.       The allegations in paragraphs 1 through 33 and 35 through 47 of Count One are incorporated herein by reference.

2.       On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### DAVID M. MORENS,

knowingly altered, destroyed, mutilated, concealed, covered up and falsified a record, document, and tangible object, as identified below, with the intent to impede, obstruct, and influence the investigation and proper administration of the Federal Records Act and the Freedom of Information Act, matters within the jurisdiction of the Department of Health and Human Services and the National Institutes of Health, a department and agency of the United States, or in relation to or contemplation of any such matter or case.

| COUNT | APPROXIMATE DATE | RECORD, DOCUMENT, OR TANGIBLE OBJECT |
|---|---|---|
| 2 | April 21, 2021 | Email correspondence of **MORENS**, CO-CONSPIRATOR 1 and others, related to **MORENS**'s official government business |
| 3 | October 24, 2021 | Email correspondence among **MORENS**, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2, and others, related to **MORENS**'s official government business |

18 U.S.C. § 1519
18 U.S.C. § 2

## COUNTS FOUR AND FIVE
### (Concealment, Removal, or Mutilation of Records)

1.      The allegations in paragraphs 1 through 33 and 35 through 47 of Count One are incorporated herein by reference.

2.      On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### DAVID M. MORENS,

willfully and unlawfully and with the intent to take, conceal, remove, mutilate, obliterated, and destroy, or attempt to do so, a record, paper, document, and thing filed and deposited with any public officer of the United States.

| COUNT | APPROXIMATE DATE | RECORD, DOCUMENT, OR TANGIBLE OBJECT |
|---|---|---|
| 4 | April 21, 2021 | Email correspondence of CO-CONSPIRATOR 1, **MORENS**, and others, related to **MORENS**'s official government business |
| 5 | October 24, 2021 | Email correspondence among CO-CONSPIRATOR 1, **MORENS**, and CO-CONSPIRATOR 2, and others, related to **MORENS**'s official government business |

18 U.S.C. § 2071(a)
18 U.S.C. § 2

_Kelly O. Hayes /By OMD_

Kelly O. Hayes
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**
Foreperson

Date: April _16_, 2026