**ATTACHMENT A**
**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Overview

On or about March 13, 2020, the President of the United States declared a nationwide emergency because of the world-wide spread of the then-novel coronavirus, SARS-CoV-2 ("COVID-19"). On or about March 15, 2020, states began to implement restrictive measures to prevent the spread of the virus. Businesses were shuttered, schools were closed, millions became sick, and over one million Americans died. And as the nation braced itself against the impact of the COVID-19 pandemic, it sought answers about the origin of the virus and how it could be prevented and treated. The COVID-19 pandemic had a profound impact on the United States, and the records generated by its agencies and employees responsible for leading the nation's response to the virus had significant historical, institutional, scientific, medical, and public value. The Defendant, **DAVID M. MORENS**, plus **Co-Conspirator 1**, **Co-Conspirator 2**, and others conspired to defraud and commit offenses against the United States by hiding from public view various federal records related to this significant historical event and during this emergency period.

Specifically, beginning in or about April 2020 and continuing through at least in or about June 2023, in the District of Maryland and elsewhere, **MORENS**, then working in the Office of the Director at the National Institute of Allergies and Infectious Diseases (NIAID) as a Senior Advisor to Senior NIAID Official 1, conspired with **Co-Conspirator 1, Co-Conspirator 2,** and others to defraud the United States by hampering, hindering, impeding, or obstructing, by craft, trickery, deceit or dishonest means, the lawful and legitimate functions of the Department of Health and Human Services (DHHS), the National Institutes of Health (NIH), or NIAID in complying with the Freedom of Information Act (FOIA) and the Federal Records Act (FRA); and to commit offenses against the United States, including: the destruction or concealment of records with the intent to impede, obstruct, or influence the investigation and proper administration of matters, or in relation to or contemplation of matters, within the jurisdiction of DHHS, NIH, or NIAID; the concealment or destruction, or attempt to do so, of records, papers, documents, or things filed and deposited with any public officer of the United States; and the direct or indirect demanding, seeking, receiving, accepting, or agreeing to receive or accept anything of value, otherwise than as provided by law for the proper discharge of official duties, for or because of official acts performed or to be performed by **MORENS** for **Co-Conspirator 1** and **Company #1.**

At all relevant times, **MORENS** was a resident of Maryland and worked at NIH headquarters in Bethesda, Maryland or from his residence in Bethesda, Maryland. As a Senior Advisor to Senior NIAID Official 1 and as a Captain in the United States Public Health Service, **MORENS** was a public official in a high-level decision making and sensitive position with a substantial influence over the decision-making process. **MORENS** gathered information from grantees and others in the scientific community to establish facts regarding the nature of COVID-

19, to understand NIH and NIAID's historical activities in coronavirus research, to assist in formulating policy and procedures, and to brief Senior NIAID Official 1 and assist Senior NIAID Official 1 in briefing others, including the President of the United States, Congress, and the public.

DHHS was a Department of the United States, and NIH was an agency of the United States.

At all relevant times, **Co-Conspirator 1** was the President and Chief Executive Officer of **Company #1.** **Company #1** was a non-profit organization headquartered in New York, New York, with a stated mission of protecting people, animals, and the environment from emerging infectious diseases. Through **Company #1, Co-Conspirator 1** researched the origins, transmissibility, virility, and impacts of potentially emergent infectious diseases, including those associated with coronaviruses originating from animals like bats (i.e. zoonotic viruses). In a Notice of Award (NOA) dated May 27, 2014, NIH/NIAID awarded Grant Number 1R01AI110964, "Understanding the Risk of Bat Coronavirus Emergence," (the "bat coronavirus grant") to **Company #1. Co-Conspirator 1** was the Project Director (PD)/Principal Investigator (PI) for the bat coronavirus grant. The Wuhan Institute of Virology (WIV) in Wuhan, China received a subaward from **Company #1** on the bat coronavirus grant.

**Co-Conspirator 2** was a physician, scientist, and professor who worked for an academic institution that also received grant monies from NIH, but not for the bat coronavirus grant. **Co-Conspirator 2** was named as a Co-Investigator with **Co-Conspirator 1** on a grant application related to Emerging Infectious Disease Research Centers filed by **Company #1** in June 2019 and awarded by NIH during the summer of 2020.

<u>FRA and FOIA</u>

HHS, NIH, and NIAID implemented and administered the FRA and FOIA. Under the FRA, a federal record encompassed all recorded information, regardless of form or characteristics, made or received by a federal agency under federal law or in connection with the transaction of public business, and preserved or appropriate for preservation by that agency. The interactions between NIH and its staff with the public and other federal agencies were captured through federal records. If information or material facilitated agency business, then it was a federal record. **MORENS** knew that email records were required to be created, sent, or received using an NIH email account; that he was not to use a personal email account to conduct NIH business; and that records were only considered personal files if the materials were not used to conduct agency business. **MORENS** knew that HHS, NIH, and NIAID received requests under FOIA for emails and other communications documenting the work and business done by the agency and its employees, including his emails and communications. **MORENS** knew that only FOIA Officers had the authority to release, apply exemptions to, or withhold records responsive to a FOIA request. **MORENS** knew there were deadlines for the production of communications responsive to a FOIA request and that FOIA requestors could sue (and had sued) HHS, NIH, and NIAID in federal court demanding the production of records unlawfully withheld from a FOIA request.

The Suspension, then Termination of the Bat Coronavirus Grant

On or about April 17, 2020, the President of the United States acknowledged his awareness of NIH grant funding directed toward research in Wuhan, China, and indicated that the funding would stop. On or about April 19, 2020, NIH issued a letter notifying **Company #1** that it was reviewing allegations that WIV released the coronavirus responsible for the COVID-19 pandemic. While it reviewed the allegations, NIH instructed **Company #1** to cease providing any funds from the bat coronavirus grant to WIV.

On or about April 24, 2020, NIH emailed **Co-Conspirator 1** a letter notifying him that NIH had elected to terminate the bat coronavirus grant (the "termination letter"). **Co-Conspirator 1** forwarded the termination letter to **Co-Conspirator 2** the same day. **Co-Conspirator 2** urged **Co-Conspirator 1** to challenge the termination but "certainly not before the EIDRC funding comes through." **Company #1** had applied to NIH for funding of an Emerging Infectious Disease Regional Center (EIDRC), a grant worth more than $7 million. At that time, the EIDRC grant had not been awarded.

Formation of the Conspiracy

On or about April 25, 2020, after learning about the cancellation of the bat coronavirus grant from **Co-Conspirator 1, MORENS** forwarded his communications with **Co-Conspirator 1** and **Co-Conspirator 2** from his NIH email account to his Gmail account. **MORENS** then emailed **Co-Conspirator 1** and **Co-Conspirator 2,** stating, "This is sent from my gmail account. Please send all replies here To gmail [...] There are things I cant say except [Senior NIAID Official 1] is aware and I have learned that there are ongoing efforts within NIH to steer through this with minimal damage to you, **[Co-Conspirator 1]**, and colleagues, and to nih and niaid."

On April 26, 2020, **Co-Conspirator 1** wrote to **MORENS** and **Co-Conspirator 2,** with copies to others, including **Company #1** staff, stating: "David – We'll communicate with you via gmail from now on."

Thereafter, **MORENS, Co-Conspirator 1, Co-Conspirator 2,** and others plotted and repeatedly expressed their intention to conceal federal records to evade FOIA and provided information to Senior NIAID Official 1 that was favorable to **Co-Conspirator 1** and **Company #1.** As part of their conspiracy against the United States, **MORENS, Co-Conspirator 1, Co-Conspirator 2,** and others did the following:

1. Used **MORENS**'s personal, non-government-issued Gmail account to create, transfer, and exchange federal records that pertained to **MORENS**'s responsibilities as a Senior Advisor at NIAID. The federal records created, transferred, and exchanged via **MORENS**'s personal, non-government-issued email address included the following types of records:

    a. controlled NIH work product;
    b. records concerning efforts to influence NIH to fund **Company #1**;

c. records concerning the **Company #1** bat coronavirus grant termination, reinstatement, suspension, and subsequent negotiations, including the drafting and editing of statements and responses on behalf of **Company #1** to NIH;
d. records concerning the drafting and sources relied upon for public writings on the origins of the COVID-19 virus;
e. records concerning congressional oversight of NIH and its grants related to COVID-19; and
f. records concerning **MORENS**'s access to Senior NIAID Official 1 and his use of that access to convey information on behalf of **Company #1** to influence Senior NIAID Official 1.

2. Concealed, removed, destroyed, attempted to destroy, and caused the concealment and removal of federal records to evade FOIA and the FRA.

3. Concealed their communications so that they could utilize **MORENS**'s status, connections, and access within the scientific community as a result of his position as Senior Advisor to Senior NIAID Official 1 to advance the interests of Company #1; within NIH/NIAID, the scientific community, and publicly.

4. Concealed their communications so that they could communicate with others in the scientific community in support of Company #1 and published papers, articles, and other writings supportive of Company #1—but without directly including Co-Conspirator 1 in the communications or as a contributor to the papers, to generate the appearance of disinterested scientific consensus and avoid the necessity of declaring competing interests.

5. Policed the use of **MORENS**'s government-issued email account by (1) reminding **MORENS** to avoid communicating using his government-issued email account and (2) explicitly requesting that those contacting **MORENS** do so through his non-government-issued email accounts to avoid exposing their communications to FOIA requests.

6. Emailed information to **MORENS** at **MORENS**'s Gmail account for **MORENS** to relay to Senior NIAID Official 1—while instructing **MORENS** to use means of communication that would not be discovered in a FOIA search.

7. Shared facts, press reports on the origin of COVID-19 and **Company #1**, information regarding the administrative proceeding on the bat coronavirus grant, information regarding Congressional inquiries and activities related to COVID-19 and the bat coronavirus grant, information regarding the drafting and publication of articles, editorials, and letters, and information relating to FOIA request to anticipate press reactions, develop talking points, and coordinate responses.

Additionally, as part of the conspiracy, **Co-conspirator** 1 provided and promised to provide **MORENS** with things of value for or because of official acts and "behind the scenes shenanigans" favorable to **Co-Conspirator 1** and **Company #1**. For his part, **MORENS** received

and agreed to receive things of value from **Co-Conspirator 1** for or because of official acts favorable to **Co-Conspirator 1** and **Company #1**, including by engaging in "behind the scenes shenanigans."

In furtherance of the conspiracy and as identified in the Indictment (ECF No. 1), **MORENS, Co-Conspirator 1, Co-Conspirator 2,** and others committed and caused the commission of numerous overt acts, in the District of Maryland, and elsewhere, to effect the objects of the conspiracy. **MORENS** stipulates to and agrees with each of the overt acts in furtherance of the conspiracy identified in paragraphs 45 through 47, and subparts, of the Indictment. Some of these overt acts are highlighted below. Unless indicated otherwise, all the communications below were sent or received by **MORENS** using his private Gmail account.

A. **MORENS** Received a Gratuity for and Because of Official Acts and Engaged in Official Acts for and Because of Gratuities Received

On or about May 16, 2020, **MORENS** emailed **Co-Conspirator 1** about an article **MORENS** was drafting in part to benefit **Co-Conspirator 1** and **Company #1**, stating: "We all agree that we want to keep off Of it any fingerprints of you, [North Carolina Scientist 1] and any [**Company #1**] or grant colleagues." **MORENS** concluded by stating: "I need to keep this off of govt email and govt phone text."

On or about June 11, 2020, **MORENS** emailed **Co-Conspirator 1** from his NIH email account stating, "let's win this anti science battle, get you refunded and über funded, then settle scores and kick some ass."

On or about June 25, 2020, **Co-Conspirator 1** gave **MORENS** two bottles of The Prisoner Red Napa Valley wine from Bounty Hunter Rare Wine & Spirits, which was delivered to **MORENS**'s residence in Maryland. The wine included the following message from **Co-Conspirator 1** to **MORENS**:

> **This is the first of what I hope will be a continued series of expressions of gratitude for your advice, support, and behind-the-scenes shenanigans in my battle against your bosses boss, his boss, and the ultimate boss on the hill. It takes courage and commitment to do what you've done, given your job and the vindictive nature of the Administration. I am eternally grateful for that, and hope I will be able to return the favor one day. In the meantime...Cheers!**

On or about June 25, 2020, upon receipt of the wine, **MORENS** emailed **Co-Conspirator 1** from his Gmail account thanking him for the wine and stating: "Now i am actually going to have to do something to deserve it. Let me think...." **MORENS** then identified acts that he had performed for **Co-Conspirator 1** and **Company #1**, including writing a "scientific commentary that outlines the importance of what [**Co-Conspirator 1**] and others have been doing, but without mentioning [**Co-Conspirator 1**] or the grant termination[.]"

On or about June 26, 2020, **Co-Conspirator 1** emailed **MORENS** at his Gmail account promising additional things of value, stating: "Consider this my phase II gift. Phase III might actually involve a meal - the Michelin starred restaurants are opening in Paris - DC and New York will do eventually!"

On or about July 3, 2020, **MORENS** submitted and caused the submission of a scientific commentary to a prominent medical journal for publication that advocated COVID-19 emerged from nature and not from a lab. **MORENS** was listed as an author on the scientific commentary. The scientific commentary was to benefit **Company #1** and **Co-Conspirator 1** and was "funded in part by the intramural research program of the National Institute of Allergy and Infectious Diseases (NIAID), National Institutions of Health (NIH)."

On or about October 6, 2021, in an email with the subject line "2nd batch of emails possibly FoIA'd," **Co-Conspirator 1** emailed **MORENS** at his Gmail account, and other individuals, to identify emails sent from **MORENS**'s NIH account that may cause issues for the co-conspirators if they were disclosed to the public via FOIA. In the email, **Co-Conspirator 1** specifically referenced one email where **Co-Conspirator 1** had "sent David a bottle of wine," but noted that "it's not absolutely cut and dried [sic] that this happened, but it gives that impression." **Co-Conspirator 1** also opined: "I believe if the wine has a value of $20 or less, that's fine."

B. **MORENS** Prepared **Co-Conspirator 1** for a Meeting with Senior NIAID Official 1 and Concealed Related Documents to Evade FOIA and the FRA.

On or about April 21, 2021, **MORENS** and **Co-Conspirator 1**, with copies to others, exchanged emails regarding a "Zoom meeting with [Senior NIAID Official 1] tomorrow." In the body of the email, **MORENS** described various topics relating to the Zoom meeting, including "what info or docs" **Co-Conspirator 1** "would or would not want" **MORENS** to share, and issues Senior NIAID Official 1 would be concerned about, including "the possibility the NIH funded scientists or other esteemed scientists, are in cahoots with politicians wanting to attack him or niaid." **MORENS** added that "it might be best to connect you two, in an off the record manner" because "[w]e are getting FOIA'd non stop, so its most important that [Senior NIAID Official 1] not have anything on the record that could come back to bite."

On or about April 21, 2021, **Co-Conspirator 1** emailed **MORENS** regarding the Zoom meeting with Senior NIAID Official 1. **Co-Conspirator 1** told **MORENS** to "Please feel free to share any docs that I've sent to you, with [Senior NIAID Official 1]. Hopefully you can do that in a way that avoids FoIA, and if not possible, just show him stuff on the screen share on Zoom." **Co-Conspirator 1** attached a document titled "Political actions regarding [**Company #1**]'s work on Coronavirus."

C. **MORENS** Reviewed, Edited, and Advised **Co-Conspirator 1** on his Responses to NIH Leadership About the Bat Coronavirus Grant and Concealed the Records to Evade FOIA and the FRA.

On or about March 29, 2021, **MORENS** used his government issued computer to make edits and comments to **Co-Conspirator 1**'s written response to two letters the NIH Deputy

Director for Extramural Research had sent about **Company #1**'s bat coronavirus grant. **MORENS** was aware that the letter would be read by the NIH Deputy Director for Extramural Research and possibly others, stating, "this will probably be read by [the NIH Deputy Director for Extramural Research] but will perhaps be leaked and ready by many oth-ers [sic]." Below is one of the comments **MORENS** made to strengthen the letter for the benefit of **Co-Conspirator 1** and **Company #1**.

> MD **Morens, David (NIH/NIAID) [E]**
>
> Peter, in this para you might say that the lab was built under international safety engineering standrads, adheres to international safety practice standards indicated in the BMBL, and the lead WIV staff were trained in safety in the United States by a known authority running the BSL-4 lab at the University of Texas Medical Branch in Galveston. You might also say that despite the claim of one individual, no safety concerns are known to have been alleged by others including safety experts
>
> March 29, 2021, 12:47 PM
>
> Reply

On or about April 11, 2021, **Co-Conspirator 1** submitted and caused the submission of the written response to the NIH Deputy Director for Extramural Research, incorporating **MORENS**'s edits and suggestions. **Co-Conspirator 1** did not disclose that **MORENS** participated in drafting the letter.

On or about October 24, 2021, **Co-Conspirator 1** and **MORENS** exchanged emails under the subject "Good news from Wuhan re. the experiments that NIH is trying to throw us under the bus with . . ." **Co-Conspirator 1** noted that Senior NIAID Official 1 had mentioned "administrative consequences" for **Company #1** having filed their "progress report" late. **Co-Conspirator 1** then asked **MORENS**, "David – could you give [Senior NIAID Official 1] a heads up about this so that he doesn't say the wrong thing publicly and also so it doesn't disparage [**Company #1**] any further."

**MORENS** responded: "[**Co-Conspirator 1**] before I speak to [Senior NIAID Official 1] can you clarify more specifically [....]."

**Co-Conspirator 1** responded to **MORENS** with more explanation and stated, in part: "I'm going to send a draft letter in a few minutes that I'm getting ready to respond to [NIH Deputy Director for Extramural Research] with. That will clarify all this, with back up evidence."

On or about October 24, 2021, **Co-Conspirator 1** emailed **MORENS**, **Co-Conspirator 2**, and the Chief of Staff for **Company #1** with the subject line, "Draft response to [NIH Deputy Director for Extramural Research] – please review." **Co-Conspirator 1** wrote that he was "trying

to rapidly respond to [the NIH Deputy Director for Extramural Research]'s letter . . . as well as to [the NIH Principal Deputy Director]'s public statement that **Company #1** failed to comply with reporting restrictions" in connection with the bat coronavirus grant. **Co-Conspirator 1** attached several documents, including a letter titled, "Response_to_[NIH Deputy Director for Extramural Research]_October_2021_DRAFT.docx." **Co-Conspirator 1** finished the email by stating: "David–I'll send some bullets for you to pass on to [Senior NIAID Official 1] later on."

On or about October 25, 2021, **Co-Conspirator 1** emailed **MORENS** under the subject line, "Short version of our response to NIH – bullets for sharing." Attached to the email was a "single sheet with bullets" for **MORENS** to share with Senior NIAID Official 1 to convince "folks at NIH" that the NIH Principal Deputy Director was wrong to criticize "[**Company #1**]'s reporting compliance." Referencing the draft letter **Co-Conspirator 1** had circulated on October 24, 2021, **MORENS** responded to **Co-Conspirator 1** stating, "[**Co-Conspirator 1**], this is an excellent draft. I will suggest some wordsmithing tweets [sic] later today."

On or about October 25, 2021, **Co-Conspirator 2** replied to the October 24, 2021 email exchange with the subject line, "Draft response to [NIH Deputy Director for Extramural Research] – please review." **Co-Conspirator 2** replied only to **Co-Conspirator 1** and the Chief of Staff for **Company #1**, leaving **MORENS** off the email. **Co-Conspirator 2** wrote:

> I just spent some time on the phone with David. He is concerned about the privacy of text and other messages from his cell phone to you and me because he has been using a government phone which permits personal conversations as well. So even things via gmail sent and received on his cell phone could be FOIA'able.

**Co-Conspirator 2** then communicated **MORENS**'s edits and suggestions to **Co-Conspirator 1**'s draft letter to the NIH Deputy Director for Extramural Research, stating "[**MORENS**] wanted to reiterate a couple of things [:]"

> First, on the timeline to make it more specific with dates and details. [NIH Program Manager for the bat coronavirus grant] is really important and being sure he is well informed, acknowledges the timeline and the communications you mention, and is on board because he will certainly be questioned. [**MORENS**] also suggested that you discuss with him the need for NIH to check the records and to confirm when documents were filed and acknowledged. And that when you were aware that it was necessary to file the 5 year report the system shut you out and you presumed that was normal process as you were then into the new grant year 1.

On or about October 26, 2021, **Co-Conspirator 1** submitted and caused the submission of a letter to the NIH Deputy Director for Extramural Research containing **MORENS**'s suggestions, including the explanation for why **Company #1** failed to timely submit its "5 year report" in connection with the bat coronavirus grant.

In sum, **MORENS** knowingly and willfully conspired with **Co-Conspirator 1**, **Co-Conspirator 2**, and others to evade FOIA and violate the FRA by concealing, destroying, and

attempting to destroy federal records used to facilitate his work as a public official and as Senior Advisor to Senior NIAID Official 1.

SO STIPULATED:

Digitally signed by JOSEPH BALDWIN
Date: 2026.06.29 14:14:52 -04'00'

______________________________
Joseph Baldwin
Bijon A. Mostoufi
Assistant United States Attorneys

______________________________
David M. Morens
Defendant

______________________________
Timothy Belevetz
Counsel for Defendant